# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANAZ K., <br>          Plaintiff, <br> v. <br> MARTIN O'MALLEY, <br> Commissioner of Social Security, <br>          Defendant. | Case No.: 22-cv-1610-DDL <br><br> **ORDER AFFIRMING DECISION OF THE COMMISSIONER OF SOCIAL SECURITY and ENTERING JUDGMENT IN DEFENDANT'S FAVOR** |

   Plaintiff Shanaz K. seeks judicial review of the Social Security Commissioner's denial of her application for disability benefits.  *See* Dkt. No. 1. The parties have consented to the undersigned's jurisdiction. Dkt. No. 5.  Plaintiff moves the Court to remand her application to the Social Security Administration for an award of benefits or, alternatively, for further proceedings.  *See generally* Dkt. No. 13.  For the reasons stated below, the Court finds the Commissioner's decision is free of legal error and supported by substantial evidence and accordingly the motion to reverse and remand is **DENIED**.  The Commissioner's decision is **AFFIRMED**.

/ / /
/ / /
/ / /

# I.

# **BACKGROUND**

## A. Plaintiff's Application for Disability Benefits

Plaintiff is a former pediatrician who suffers from various eye diseases and conditions, including glaucoma,[1] staphyloma,[2] and myopia. On December 5, 2016, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act (the "Act"), alleging that these conditions rendered her unable to work as of December 1, 2014. *See* AR at 187.[3] After the Commissioner denied her application on May 23, 2019, Plaintiff appealed on August 31, 2020. *Id.* at 511-20. However, Plaintiff and the Commissioner jointly moved to remand the matter, which was granted. *Id.* at 433-48. Further proceedings were conducted, including a hearing before ALJ Deborah J. Van Vleck, at which Plaintiff appeared with counsel and gave testimony. *Id.* at 464-507. In an opinion dated July 6, 2022, the ALJ concluded Plaintiff was not disabled within the meaning of the Act "at any time from . . . the alleged onset date through . . . the last date insured." *Id.* at 441-56. The ALJ's decision became the final decision of the Commissioner by operation of 42 U.S.C. § 405(h).

/ / /

---

[1]   Glaucoma develops when the optic nerve is damaged and can cause blind spots. The damage to the optic nerve is usually the result of increased pressure in the eye. *See* Mayo Clinic, "Glaucoma," https://www.mayoclinic.org/diseases-conditions/glaucoma/symptoms-causes/syc-20372839 (last accessed March 4, 2024).

[2]   "A staphyloma is an abnormal protrusion of the uveal tissue through a weak point in the eyeball. In the posterior segment of the eye," a staphyloma "result[s] in progressive myopia (nearsightedness)." Certified Administrative Record ("AR") [Dkt. No. 9] at 74.

[3]   The Court uses the parties' pagination of the AR. All other docket citations are to the page numbers generated by the Court's CM/ECF system.

B.   **Summary of the ALJ's Findings**

A person is considered "disabled" within the meaning of the Act if they suffer from a medically determinable physical or mental impairment which is expected to last at least a year and is of such severity that they cannot work, considering their age, education, and work experience. *See* 42 U.S.C. § 423(d). The Administration employs a sequential five-step evaluation to make this determination.[4]

The ALJ followed this five-step process in adjudicating Plaintiff's disability claim. *See generally* AR at 441-456. At step one, the ALJ found Plaintiff did not engage in substantial gainful activity from the alleged date of the onset of Plaintiff's disability through her last date insured.[5] *Id*. at 444. At step two, the ALJ found Plaintiff suffered from "a visual impairment diagnosed to include chronic open angle glaucoma, vitreous degeneration and detachment, posterior staphyloma, and degenerative malignant myopia," which significantly limited Plaintiff's ability to perform basic work activities. AR at 445. At step three, the ALJ found Plaintiff did

---

[4]   *See* 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is engaged in substantial gainful activity. Second, the ALJ must determine whether the claimant suffers from a severe impairment within the meaning of the regulations. Third, if the claimant suffers from a severe impairment, the ALJ must determine whether the impairment meets or is medically equal to one of the impairments identified in the Listing of Impairments. Fourth, if the impairment does not meet or equal a listing, the ALJ must determine the claimant's residual functional capacity ("RFC") based on all impairments (including those that are not severe) and whether, given the RFC, the claimant can perform his or her past relevant work. At the fifth and final step, the ALJ must determine whether the claimant can make an adjustment to other work based on his or her RFC.

[5]   Plaintiff last met the insured status requirements of the Act on December 31, 2016 (the "last date insured"). *See* AR at 442. Therefore, to be eligible for benefits, Plaintiff must have been disabled on or before that date. *See id*.; *accord* 42 U.S.C. § 416(i)(2) and (3) (defining "period of disability" and eligibility requirements). The ALJ referred to the period between the alleged onset date (December 1, 2014) and the last date insured (December 31, 2016) as the "period at issue," and the Court does the same.

not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in the Listing of Impairments through the date last insured. *Id*.

Before proceeding to step four, the ALJ determined that through the date last insured, Plaintiff could:

> perform light work as defined in 20 CFR [§] 404.1567(b)[6] except that while [she] could frequently climb ramps or stairs, . . . she could never climb ladders, ropes or scaffolds. The claimant could frequently balance, and could occasionally stoop, kneel and crouch, but she could never crawl. [Plaintiff] could no more than occasionally read ordinary newspaper or book print, but could avoid ordinary hazards in the workplace. [Plaintiff] could never work in the presence of unprotected heights or hazardous machinery, and could not be required to operate a motor vehicle as part of her job duties.

*See* AR at 445-46.

In formulating this RFC, the ALJ considered Plaintiff's subjective testimony regarding her limitations. *Id.* at 446-48. The ALJ noted Plaintiff's statement she was unable to work "due to poor vision related to a visual impairment she described as glaucoma, staphyloma, malignant myopia and problems with her retinas," and Plaintiff's hearing testimony she could not run or jump, could lift only 5 or 10 pounds, suffered from blurred vision and sensitivity to bright light, and must avoid "fast head movements." *Id.* at 446-49. Evaluating these allegations in conjunction with the objective medical evidence of record, the ALJ concluded that although the

---

[6] "Light work" is defined as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," and may require "a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). A person who is capable of light work is also considered capable of sedentary work, "unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.*

totality of the evidence supported the existence of an impairment that limited Plaintiff's work activities, but that Plaintiff's limitations were not as great as she subjectively alleged and she "retained the ability to perform work at the light exertional level through the last date insured." *Id.* at 449; *see also id.* at 446-47 (noting Plaintiff's "allegations represent a high degree of limitation that would substantially interfere with the performance of work-related tasks" that was "not . . . supported by the evidence of record during the period at issue").

The ALJ also considered the opinion evidence and prior administrative medical findings in the record. AR at 449. The ALJ afforded "partial weight" to the findings of state agency medical consultants R. Masters, M.D. and S. Lee, M.D. *Id.* The ALJ observed Dr. Masters' findings did not account for additional medical evidence submitted on reconsideration and thus concluded they were "insufficiently restrictive." *Id.* at 450. While Dr. Lee considered the additional evidence, his "total lack of any proposed exertional or postural limitations" was also "insufficiently restrictive" in light of the medical evidence in the record. *Id.* The ALJ incorporated certain of Dr. Lee's recommendations, such as limitations against exposure to hazards and driving, but "decline[d] to adopt Dr. Lee's findings in their entirety." *Id.*

The ALJ afforded "little weight" to the opinions of Sam Nikou, M.D., Plaintiff's treating ophthalmologist. AR at 450. After describing Dr. Nikou's various medical source statements and the proposed work restrictions proposed therein, the ALJ observed a "significant degree of variation" in those limitations that did "not correspond[] to any commensurate changes in the claimant's underlying condition." *Id.* at 452. The ALJ likewise found Dr. Nikou's exertional, postural and visual limitations inconsistent with the objective medical evidence, noting, for example, that "there [was] no evidentiary basis for a total restriction against reading regular print." *Id.* at 452-53. The ALJ further found some of Dr. Nikou's proposed limitations, such as allowing for frequent breaks during the workday, did not bear

any "rational connection" to the identified elevated risk of retinal detachment. *Id.* at 452. The ALJ also explained that Dr. Nikou's recommendations for "prophylactic measure[s] against future disease progression" were "of limited probative value" given the remoteness of Plaintiff's alleged onset date and last date insured. *Id.* The inconsistencies with the objective evidence and the lack of any apparent relationship between the recommended limitations and Plaintiff's conditions "undermined [Dr. Nikou's] opinions" and the ALJ accordingly "declined to adopt any of his varied opinions as to [Plaintiff's] functional capacity." *Id.* at 453.

Finally, the ALJ considered a Third Party Function Report completed by Plaintiff's mother. *Id*. The ALJ noted Plaintiff's mother was not a medical source, and that she completed her report more than two years after the last date insured, "calling into question the degree to which her statements are applicable . . . to the period at issue." *Id.* The ALJ also found the mother's report found "little support" in the objective medical record, and therefore carried "little weight." *Id.*

Having considered the totality of the evidence, the ALJ concluded:

> the evidence of record clearly documents the presence of eye conditions throughout the period at issue here, giving rise to a reduction in the claimant's visual acuity, but [Plaintiff] appears to have retained at least fair vision through her date last insured, with little evidence of material disease progression until several years after the expiration of her period of insured status.

AR at 448. Accordingly, the ALJ determined during the period of her alleged disability, Plaintiff "retained the capacity to perform light work," subject to "additional postural, environmental, and visual limitations" as described above. *Id.* at 453. Based on this RFC, the ALJ found at step four Plaintiff could not perform her past relevant work as a pediatrician. *Id*. at 453-54.

At step five, the ALJ found "there were jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed," based on

/ / /

the vocational expert's testimony regarding jobs which could be performed by someone with Plaintiff's RFC.  AR at 454, 456.

Based on the foregoing five-step analysis, the ALJ concluded Plaintiff had not been under a disability within the meaning of the Act between the alleged onset of her disability and her last date insured.  *Id.* at 456.

## II.
## DISPUTED ISSUES

Plaintiff's single claim of error is that the ALJ failed to articulate specific and legitimate reasons, supported by substantial evidence, for rejecting Dr. Nikou's treating medical opinion.  *See* Dkt. No. 13 at 4.  In opposition, the Commissioner's argues "[t]he ALJ reasonably gave less weight to Dr. Nikou's opinions based on [the] myriad of inconsistencies" in them.  Dkt. No. 15 at 4.

## III.
## STANDARD OF REVIEW

The Court's review of the Commissioner's final decision is "highly deferential."  *Kitchen v. Kijakazi*, 82 F. 4th 732, 738 (9th Cir. 2023).[7]  The Court "will disturb the denial of benefits only if the decision contains legal error or is not supported by substantial evidence."  *Id.*  "Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and must be more than a mere scintilla, but may be less than a preponderance."  *Id.*  This Court must review the entire record and consider adverse as well as supporting evidence.  *See Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021).  The Court "may not reweigh the evidence or substitute [its] judgment for that of the ALJ."  *Id.*  Moreover, "[t]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving

---

[7] All citations, internal quotation marks, and subsequent history are omitted unless otherwise noted.

ambiguities." *Id.* If the evidence is susceptible of more than one rational interpretation, the ALJ's decision must be upheld. *See id.* at 1115-16. However, the Court cannot affirm "on a ground upon which [the ALJ] did not rely." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014). Where the ALJ commits legal error, the Court may affirm the decision if the error is harmless, meaning "it is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015).

## IV.
## DISCUSSION

### A. The ALJ Did Not Err in Weighing Dr. Nikou's Opinion

An ALJ must consider all evidence, including medical opinions, in determining whether the claimant is disabled. *See* 20 C.F.R. § 416.920(a)(3). As Plaintiff correctly points out, because her application for benefits was filed before March 27, 2017, the operative regulatory framework required special consideration of Dr. Nikou's opinion as her treating physician. Dkt. No. 13 at 7; *see also* Dkt. No. 15 at 2. Pursuant to the then-operative regulations, "[a] treating or examining physician's medical opinion was afforded greater deference due to his or her relationship to the claimant." *Cross v. O'Malley*, 89 F.4th 1211, 1214 (9th Cir. 2024).[8] To disregard a treating provider's opinion under these regulations, the ALJ must give "'specific and legitimate' reasons for doing so, based upon substantial evidence in the record." *Id.* The ALJ satisfies this requirement "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof, and making findings." *Magellanes v.*

---

[8] The regulations no longer require the ALJ to give greater weight to a treating physician's opinion. *See id.*; *see also* 20 C.F.R. §§ 404.1520c and 404.1527.

*Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Furthermore, although a treating provider's opinion is afforded relatively greater weight than the opinion of an examining or non-examining physician under these regulations, the opinion is "'not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability," which remains the province of the ALJ. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004).

Plaintiff argues the ALJ failed to articulate specific and legitimate reasons for affording Dr. Nikou's opinion little weight, stating the ALJ's reasons for doing so are "internally inconsistent," not supported by the evidence, and not legitimate. *See* Dkt. No. 13 at 5-10. The Court disagrees.[9] The ALJ declined to adopt Dr. Nikou's opinions because the "significant degree of variation" among them undermined their supportability. AR at 452; Dkt. No. 13 at 7. That conclusion follows a lengthy cataloging of Dr. Nikou's assessment of Plaintiff's ability to work between 2010 and 2019, revealing numerous inconsistencies in Dr. Nikou's opinions. AR at 450-52.

For example, the ALJ observed the following diverse recommendations and assessments by Dr. Nikou:

- **Driving.** Dr. Nikou variously stated Plaintiff was prohibited only from "night driving" (August 2012, June 2013, March 2014, April 2017, April 2018, April 2019 and June 2021); could drive "rarely" (April 2016); could not drive or operate machinery whatsoever (May 2019); and was restricted only from "distance driving" (April 2022). AR at 450-51 (citing *id.* at 215-16, 416-17, 428-31, 435, 853-54, 798, 801, 811, 829, 843, and 847).

---

[9]   Plaintiff's arguments regarding the ALJ's "implicit" or unspoken findings are not persuasive. *See* Dkt. No. 13 at 6 ("To the extent the ALJ used the reviewing opinions to reject the opinions of Dr. Nikou . . ."); 7 ("To the extent the ALJ may have thought . . ."); 9 ("The ALJ implicitly admitted . . ."). The ALJ's opinion is straightforward and plainly written, and the Court does not find it necessary to speculate about the ALJ's findings.

- ***Bending, squatting and stooping.*** Dr. Nikou likewise conflictingly stated Plaintiff could "frequently" twist, crouch, squat, and climb ladders or stairs (April 2010 or 2011); could "never" stoop or bend and "rarely" crouch or squat (April 2016); could "rarely" stoop or bend and "occasionally" crouch or squat (April 2019), and could not be required to do any bending or lifting (May 2019). *Id.* (citing *id.* at 216, 358-59, 416, and 435).

- ***Visual limitations.*** Dr. Nikou's recommended visual restrictions were at times "unspecified," but when specified were in conflict, with competing statements that Plaintiff could "occasionally" work with small objects or could not work with them at all (April 2016 and April 2019, respectively); either "rarely" or "occasionally" use color vision (same); use tools and small parts but had impaired attention to detail (April 2016 and April 2022, respectively). *Id.* (citing *id.* at 215-16, 358-59, 416, and 853-54).

By identifying these conflicting statements in Dr. Nikou's various opinions, the ALJ provided a specific and legitimate reason for discounting this opinion evidence. *See Ford*, 950 F.3d at 1154 (finding no error where ALJ rejected treating provider's opinion as "inconsistent with medical evidence, including previous medical opinions contained in his own notes"). Furthermore, although Plaintiff's counsel characterized these discrepancies as an opinion that had "evolved," AR at 472, the ALJ correctly observed that the changes in Dr. Nikou's recommendations did not correlate with any change in Plaintiff's condition, which remained relatively unchanged during the period at issue. *Id.* at 452. This was a further specific and legitimate reason for discounting Dr. Nikou's opinion. *See Batson*, 359 F.3d at 1195 ("[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole . . . or by objective medical findings.").

The ALJ also found Dr. Nikou's recommendations were "largely inconsistent with the evidence of record," including his own treatment notes. AR at 452. For example, although Dr. Nikou recommended Plaintiff be restricted to working "in dim light," there were no references to Plaintiff's alleged photophobia in Dr. Nikou's

treatment records. *Id.* Dr. Nikou's recommendations regarding Plaintiff's alleged visual field defect were directly contradicted by evidence that throughout the period at issue and even thereafter, Plaintiff's visual field remained "full to confrontation." *Id.* A treating provider's opinion is properly rejected where the provider's own "treatment notes provide no basis for the functional restrictions" proposed. *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003); *accord Jeanette R. v. Kijakazi*, 620 F. Supp. 3d 1127, 1143 (E.D. Wash. 2022) ("[A]n ALJ is not obliged to credit medical opinions that are unsupported by the medical source's own data . . ..").

The ALJ relatedly found several of Dr. Nikou's recommendations lacked evidentiary support (such as the total prohibition on reading regular print) or were simply untethered to Plaintiff's documented impairments and the corresponding risk of retinal detachment (such as the purported need for unscheduled breaks during the workday). AR at 452. These findings and observations are further specific and legitimate reasons in support of the ALJ's weighing of Dr. Nikou's opinions. *See Coleman v. Saul*, 979 F.3d 751, 757 (9th Cir. 2020) (finding ALJ "did not err in concluding that the opinions assessing severe limitations were unsupported by the record, thus furnishing a specific and legitimate reason to discount [them]").

Even under the then-existing opinion hierarchy, the ALJ was not required to "take [Dr. Nikou's] opinions at face value." *Ford*, 950 F.3d at 1155; *see also Cross*, 89 F.4th at 1213 (same). For the reasons stated above, the Court finds the ALJ's conclusion that the "inconsistency and poor supportability" of Dr. Nikou's opinions "significantly undermine[d]" them, AR at 453, is adequate reason to afford those opinions little weight. The Court further finds the ALJ's reasons were well-supported by reference to the objective medical record. Accordingly, the Court finds the ALJ did not err in weighing Dr. Nikou's opinions, and the ALJ's resulting determination that Plaintiff was not disabled between December 1, 2014 and December 31, 2016 was not the product of legal error.

### B. The ALJ's Nondisability Determination Is Supported by Substantial Evidence

Having found the ALJ's analysis free of legal error, the Court turns to the question of whether the ALJ's decision is supported by substantial evidence. The Court has independently "assess[ed] the entire record, weighing the evidence both supporting and detracting from the [ALJ's] conclusion," *see Ahearn*, 988 F.3d at 1115, and finds substantial evidence supports the ALJ's nondisability determination. A summary of that evidence follows.

The record confirms Dr. Nikou diagnosed Plaintiff with myopia, retinal degeneration and staphyloma as early as 2003 and that these conditions persisted through the period at issue and afterwards. *See, e.g.*, AR at 392, 397, 408, 790-91. By 2009, Dr. Nikou suspected Plaintiff had glaucoma and his diagnosis of chronic open angle glaucoma was confirmed as of 2012. *See id.* at 393, 407. Plaintiff began complaining of "flashes and floaters" in 2014, and Dr. Nikou diagnosed her with vitreous opacities. *Id.* at 382.

Dr. Nikou's office notes demonstrate Plaintiff's bilateral visual acuity remained consistently in the range of 20/30 to 20/40 before, during and after the period at issue. *See, e.g.*, AR at 374, 377, 379-382, 400-401, 403, 407, 804-05, 813-15. Records of Plaintiff's treatment at Shiley Eye Center during this timeframe, although limited, confirm these visual acuity findings. *See id.* at 368-70. Dr. Nikou's examination findings dated between 2009 and 2017 also document Plaintiff's visual field was full to confrontation in both eyes. *See, e.g., id* at 374, 377, 379-382, 400-401, 403, 407, 804-05, 813-15. During this period, Plaintiff complained of floaters, flashes, foreign body sensation, itching, and decreased or blurry vision, but did not complain of sensitivity to light. *See id.*

Although they post-date the period at issue by several years, the Court also observes Plaintiff's most recent treatment records from Shiley Eye Institute document several visits in 2020 and 2021 at which Plaintiff reported she had "no

visual complaints or discomfort" other than dissatisfaction with her corrective lenses. *See*, *e.g.*, AR at 761, 762, 768, 771. Plaintiff did not report any sensitivity to light during these visits. *See id*. Her visual acuity continued to remain approximately 20/40 bilaterally and there is no indication of a visual field defect. *See id*. at 763, 769.

State agency consultant Dr. Masters noted in an initial disability evaluation dated April 19, 2017 that there were no visual field tests in the record, "perhaps because the principal [diagnoses] (bilateral posterior staphylomas, mild glaucoma, and malignant myopia) do not usually produce v[isual] f[ield] impairment." AR at 74. At the reconsideration level, state agency consultant Dr. Lee noted on June 8, 2017, that Plaintiff's "recent vision evaluations have been mostly w[ithin] n[ormal] l[imits]." *Id.* at 84.

At the hearing on June 13, 2022, Plaintiff testified she lives alone (although she was living with her mother during the period at issue) and as long as she does not lift anything heavy and stays out of bright light, she has no difficulty managing herself. *See* AR at 479-80. She is – and was during the period at issue – able to walk, stand and sit without limitation. *Id.* at 489-90. Plaintiff was, and remains, able to perform self-care and to dress herself, including fine motor manipulations such as buttoning buttons, without difficulty. *Id.* at 490-91. During the day she drives short distances, runs errands, buys groceries and does light housework. *Id.* at 492-94. She can read emails and operate her cell phone. *Id.* at 495. She testified she can read documents in 14-point font, albeit slowly and only "if the light is right." *Id.* at 496. Plaintiff's testimony is consistent with her mother's 2019 report that Plaintiff takes "short daily trips" to the grocery store, bank, post office and doctor's office, reads news or emails on her computer, and does light chores such as vacuuming. *See* AR at 321-46.

The Court finds the foregoing is relevant and substantial evidence adequate to support the ALJ's assessment of Plaintiff's RFC and subsequent determination

that Plaintiff was not disabled during the period at issue. *See Kitchen*, 82 F. 4th at 738; *see also* 42 U.S.C.A. § 405(g) (providing that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").  Accordingly, the ALJ's decision will not be disturbed.  *See Ahearn*, 988 F.3d at 1115 ("If substantial evidence in the record supports the ALJ's decision we must defer to the ALJ.").

## V.
## CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ's decision was not legally erroneous and was supported by substantial evidence. Plaintiff's request for reversal and remand is therefore **DENIED**. The final decision of the Commissioner of Social Security is **AFFIRMED**. The Clerk of the Court shall enter judgment accordingly and terminate the case.

**IT IS SO ORDERED.**

Dated: March 4, 2024

Hon. David D. Leshner
United States Magistrate Judge